## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NJOY, INC.,[1] | Case No. 16-12076 (___) |
| Debtor. | |

## DECLARATION OF JEFFREY WEISS IN SUPPORT OF FIRST DAY MOTIONS

I, Jeffrey Weiss, hereby declare under penalty of perjury:

1.      I am the Interim President and General Counsel of NJOY, Inc. (the "**Debtor**" or "**NJOY**"), a corporation organized under the laws of the State of Delaware with its principal place of business in Scottsdale, Arizona.

2.      I have been serving as General Counsel of the Debtor since November 1, 2012.  I have been serving as Interim President of the Debtor since July 20, 2016.  I oversee the Debtor's day-to-day business operations and legal interests.

3.      I submit this declaration ("**Declaration**") in support of the Debtor's chapter 11 bankruptcy petition and in support of the Debtor's "first day" motions and applications, described in further detail below (collectively, the "**First Day Motions**").  I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

4.      I, or those employees of the Debtor under my supervision, am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtor's

---

[1]     The last four digits of the Debtor's federal tax identification number are 6013.  The Debtor's mailing address and principal place of business is 15211 N. Kierland Blvd., Suite 200, Scottsdale, Arizona 85254.

management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtor's operations and financial affairs as well as the Debtor's books and records, or my opinions based upon my experience and knowledge. If called as a witness to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5.    On the date hereof (the "**Petition Date**"), the Debtor filed its voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") commencing the above-captioned bankruptcy case (the "**Case**"). It is anticipated that the Debtor will continue to manage its affairs and operate its business as debtors and debtors-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

6.    I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtor into this Case and permit the Debtor to achieve its bankruptcy objectives as further described below.

7.    Part I of this Declaration describes the Debtor's business, capital structure and the events leading to the filing of the Petition. Part II of this Declaration sets forth the First Day Motions[2] and sets forth the relevant facts in support of those motions.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

## Background

### A. History of the Debtor and the E-Cigarette Market

8.     Founded in September 2006, the Debtor was originally incorporated as Sottera Inc., a Nevada corporation, and later reincorporated in 2012 under the name NJOY, Inc., as a Delaware corporation.  The Debtor is a leading independent manufacturer and distributor of electronic nicotine delivery systems (ENDS) – specifically, e-cigarettes and vaping products, in the United States, selling its products directly to major wholesalers, distributors and retailers. The Debtor also has an e-commerce outlet where its products can be purchased directly by the consumer.

9.     The Debtor has prioritized R&D in order to develop and innovate new ENDS products, with the goal to end smoking-related death and disease by offering reduced-harm alternatives to combustion cigarettes.  As one of the largest independent (e.g., not affiliated with a tobacco manufacturer) ENDS producers in the United States, the Debtor has worked to define the category and engage in productive and collaborative discussions with regulators, public health experts and legislators. The Debtor has invested a great deal of resources in the science and technology of ENDS, and currently holds more than 20 issued patents and has filed more than 60 non-provisional patent applications.

10.     **The ENDS Solution -** ENDS offer a new alternative to smoking combustible cigarettes, which emerging science is beginning to strongly indicate reduces the risk of many chronic diseases from smoking by delivering substantially fewer toxicants.[3] ENDS

---

[3] For example, in August 2015, Public Health England (PHE), an agency of Britain's Department of Health, issued a 111-page report on electronic cigarettes that carefully addressed every significant concern that has ever been raised about these products. While PHE recognized that certain health questions can be answered only through long-term safety data, its experts estimated, based on what is known of the chemistry of cigarette smoke and e-cigarette vapor, that electronic cigarette use is likely to be around 95% less harmful to the user's health than smoking

imitate the visual, physical and psychological features of combustible cigarettes to facilitate switching. ENDS products can currently be used in more locations than combustible cigarettes and do not produce an odor of the type associated with cigarettes. They can also offer flavor alternatives that may provide an enhanced satisfaction experience for smokers, making them an even more viable alternative. The ENDS market is comprised of electronic cigarettes that look and feel like a traditional cigarette, also called "cigalikes" (disposable and rechargeable), and vaping devices (open and closed system) as defined below:

- Disposable e-cigarettes: An e-cigarette is a battery-operated device that contains e-liquid (described below) and a heating element. Disposable e-cigarettes offer the most convenience to customers with no assembly or charging and is the most "familiar" to a smoker who is newly entering the ENDS category.

- Rechargeable e-cigarettes: Rechargeable e-cigarettes work the same way as disposables, but are comprised of two pieces: a rechargeable battery section and a disposable cartridge containing the e-liquid.

---

traditional combustion cigarettes. *E-Cigarettes: An Evidence Update;* A Report Commissioned By Public Health England. PHE Publications Gateway Number: 2015260; see also Statement by Attorney General Tom Miller on Electronic Cigarettes ("The harm of the combustible cigarette is dramatically greater than the harm of the e-cigarette. The combustible cigarette is by far the most harmful consumer product known to mankind, killing 480,000 people each year in the United States alone. This is largely due to the many deadly toxins created and released by the combustion. A panel of experts estimates that the e-cigarette is 95 percent less harmful. Some push back on this study, in part questioning the ability to put an exact number on it. Another estimate is 90-98 percent less harmful. But whatever number is correct, e-cigarettes are dramatically less harmful than combustible cigarettes.") (https://www.iowaattorneygeneral.gov/newsroom/statement-by-attorney-general-tom-miller-on-electronic-cigarettes/).

In July 2015, a research paper was published that assessed the potential irritant effects of electronic cigarette vapor on the human airway, by comparing exposure of reconstructed, three-dimensional, human airway tissue in a laboratory setting to three different test conditions: (a) six hours of exposure to electronic cigarette vapor from two different ENDS products, (b) to six hours of exposure to smoke from a traditional combustion cigarette, and (c) to 6 hours of exposure to untreated air. The researchers concluded that the 6 hour exposure to traditional cigarette smoke caused near-complete cell death, while the exposure to electronic cigarette vapor showed no irritant effects on the reconstructed human airway and, indeed, the authors of the study observed no statistical difference between the results of exposure to electronic cigarette vapor and to untreated air. While Debtor was not involved in or aware of the study until it was published, both ENDS products used in the research were NJOY products. *Toxicology in Vitro*; 06/2015 doi:10.1016/j.tiv.2015.05.018.

- Vaping systems: Vaping devices (often called Vape Pens or "Mods") appear significantly different from combustible cigarettes and e-cigarettes, with a variety of sizes and mouthpieces. A vape device consists of a rechargeable battery and a tank that screw together, and the tank contains the atomizer and is filled with e-liquid. The tanks are most often refillable by the user (called "open systems"), offering consumers the ability to separately purchase their e-liquid in bottles in a variety of flavors. The Debtor also offers a "pre-filled" tank system (also called "closed systems"), which provides the user with the convenience of a rechargeable e-cigarette (because there is no filling required), but with the performance of a higher-powered battery and more effective atomizer.

- E-liquid: E-liquid is the solution that is used in ENDS products to provide the nicotine. E-liquids can be purchased separately by the consumer for use in an open system tank Vape Device.

11.    Public health experts across the spectrum have supported the potential benefits of ENDS for adult smokers who are able to switch completely from a combustible product to an ENDS product. Further, although currently proposed U.S. regulations prohibit ENDS manufacturers from making smoking cessation or other health claims for tobacco products, research is beginning to show that many smokers are able to utilize ENDS effectively as a complete substitute for combustion smoking.[4]

12.    Recently, the Debtor successfully completed a Phase 1 contract with the National Institute on Drug Abuse ("**NIDA**"), which is part of the National Institutes of Health ("**NIDA**"),

---

[4] In its August, 2015 Policy Statement (See fn. 3), Public Health England found that ENDS products "have rapidly become the most widely used quitting aid in England." *E-Cigarettes: A New Foundation For Evidence-Based Policy And Practice* PHE publications gateway number: 2015260.

for the development of a "reference" or standardized rechargeable ENDS. Specifically, NIDA has recognized that there is a substantial public health interest in understanding the safety parameters and smoking alternative potential of ENDS products, which will require the conduct of multiple well-designed studies conducted by independent investigators with government funding, and the referenced ENDS product being developed by the Debtor is intended to be utilized in government-funded ENDS studies. NIDA has noted that ENDS have the potential to alter dramatically the trajectory of combustion-cigarette-caused death and disease.

### B. Debtor's Business Operations

13.    **Products** – The Debtor was the first major ENDS company to offer products across all form factors: disposable and rechargeable cigalikes, open system e-liquids and vaping devices, and advanced closed system e-liquids. Additionally, the Debtor was the first major ENDS company to offer all form factors across all major channels of distribution: convenience stores, drug stores, mass merchandisers, vape shops, and on-line. In 2011, the Debtor introduced the NJOY King, a disposable e-cigarette which replicates the size and feel of an actual cigarette. It is paper-wrapped with a soft, filter-like mouthpiece, and the end progressively lights up along a portion of the stick when a consumer inhales, similar to a combustible cigarette. In 2014, the Debtor introduced an innovative rechargeable e-cigarette platform. The rechargeable platform provides smokers with a rechargeable battery system and replaceable e-liquid-containing cartridges. The rechargeable product has innovative characteristics, such as press-fit technology (that attaches the cartridge to the battery), improved vapor output and convenient USB-integrated packaging, targeting consumer dissatisfaction with other rechargeable offerings. Also in 2014, NJOY became one of the first national brands to introduce a vaping platform into traditional retail outlets such as convenience stores and drug stores, including an e-liquid line for traditional

retail channels, and a premium line of complex e-liquids crafted by five of the leading artists in the vape industry for the vape shop channel.   In early September, 2015, NJOY introduced two new product launches for its traditional retail channel: a disposable e-cigarette called the "NJOY Daily", which has been shown to be more than 90% as effective as traditional combustion cigarettes in the first 7 minutes of use; and a closed-system atomizer (pre-filled with NJOY's e-liquid) called a "Pre-Filled Tank", which has an advanced atomizer design that provides the performance of leading atomizers sold at vape shops at a fraction of the cost.

14.      **Suppliers** – The Debtor has no in-house manufacturing capabilities.  Its products are manufactured to meet the Debtor's design specifications by third-party manufacturers.  The Debtor's hardware is sourced from two major suppliers in China.  The Debtor sources e-liquids from facilities based in the United States.

15.      **Distribution** – The Debtor's products are sold globally through multiple channels, including through traditional retail locations and direct online sales to consumers.  In the United States, the Debtor's distribution approach is primarily via brokers and distributors, reaching approximately 21,249 locations, and the products are present in 23 of the top 25 convenience store chains as well as 7 of the top 10 supermarket chains.

16.      **Employees** - As of September 9, 2016, the Debtor had a total of 15 employees, including 14 salaried Full Time Employees and 1 hourly Full Time employee.  None of the Debtor's employees are represented by a labor union.

17.      **Facilities** – The Debtor's corporate headquarters, which includes research and development, marketing, business operations and executive offices, is located in Scottsdale, Arizona.  The Scottsdale location consists of 15,977 square feet of space under a lease that

expires in April 2018; of that space, the Debtor has subleased 6,299 square feet of space to a sub-tenant, the terms of which run concurrent with Debtor's lease.

18.     The Debtor's affiliate in the United Kingdom leases 2,637 square feet in London that was used for its International Headquarters under a lease that expires in January 16, 2018, but subleased this space to a sub-tenant, the terms of which run concurrent with Debtor's lease, and entered a new lease effective on July 1, 2016 for 900 square feet under a lease that expires December 31, 2016.  The Debtor owns no real property.

## C. Organizational Structure, Governance, and Current Management

19.     The Debtor is a privately-held Delaware corporation reincorporated in 2012.  In 2013, the Debtor formed a wholly owned subsidiary, NJOY Innovations Ltd., a United Kingdom (UK) corporation to commercialize sales of the Debtor's products in Europe.

20.     The Debtor has a single member board of directors comprised of Michael Rubin, who is also the Executive Chairman.  As stated above, in July 2016, the Debtor appointed me the Interim President as part of a restructuring of its management team.  In addition, I am continuing to serve as the Debtor's General Counsel.

## D. Capital Structure

21.     As of June 30, 2016, the Debtor's unaudited consolidated financial statement reflects total current liabilities of $32,172,783 which includes a total product returns reserve of $6,485,668.  The Debtor's principal source of liquidity has been from proceeds from sales of common stock and convertible redeemable preferred stock, and to a lesser extent, its line of credit.  From January 2, 2014 through June 30, 2014, the Debtor received an aggregate of $221.2 million from sales of common stock and convertible redeemable preferred stock.

22.     **Secured Debt** – On March 3, 2015, the Debtor entered into a Credit Agreement with Victory Park Management, LLC, as agent on behalf of the lender parties thereto, for a $12,000,000 revolver commitment and a $10,000,000 term commitment (the "**Victory Park Facility**").   On August 5, 2015, FLFC Lending Co. ("**FLFC**") purchased the Victory Park Facility.   On October 16, 2015, the debtor completed a placement of $12.8 million of Second Lien Convertible Notes. The Victory Park Facility, the term loans and the second lien convertible notes are collateralized by the Debtor's accounts receivable, inventory, property and equipment, and other assets. As of August 25, 2016, the Debtor has raised a total of $15.2 million of term loans.

23.     As of June 30, 2016, the company had $3,806,549 of outstanding loans against the revolving loan commitment, from FLFC. In addition there are approximately $9.6 million in term loan commitments and $14.7 million of second lien convertible notes.

24.     **Trade Payables** – As of June 30th 2016, the Debtors' accounts payables amounted to approximately $14,022,269. Of the company's trade payables, $3.85 million are related to sponsorship agreements with Caesars Entertainment, $4.0 million are related to various law firms that have represented the Debtor and $2.9 million are related to customers (either distribution partners or convenience store chains) that the company has taken returns for products and offered credit against future purchases in return.

25.     **Equity Interests** – As of June 30, 2016, the Debtor had outstanding Convertible Redeemable Preferred Stock of Series E (the "**Preferred Stock**"). Prior to the Petition Date, the Company had also issued and sold common stock, treasury stock, common stock warrants and stock options.

## E.  Circumstances Leading to Chapter 11 Filing.

26.     **Kings 2.0 Failure/Relaunch of NJOY Brand -** In the fourth quarter of 2013, the Debtor launched the second generation of the King disposable e-cigarette that included new technology known internally as Kings 2.0.   Unfortunately, the Kings 2.0 was not ultimately accepted by the marketplace.  The Debtor ceased the manufacturing of this product in January 2014 and replaced it with an improved product; however, the Debtor incurred substantial incremental costs in making the switch. The negative impacts on the Debtor's financial results in the fourth quarter of 2013 and the six months ended June 30, 2014 included higher reserves for retail customer returns as the Debtor replaced some of the Kings 2.0 product in the marketplace, as well as inventory write-offs.  Specifically, gross profit decreased $15.2 million as of June 30, 2014 primarily related to the Kings 2.0 launch, including $16.2 million of inventory reserves and $9.0 million in excess product returns.   In the first half of 2014, the Debtor recorded an additional $3.9 million of excess product returns reserve as a reduction in net sales. The Debtor also experienced a decrease in customer orders during this time.  Specifically, following a peak of $92.9 million in 2013, gross sales of Kings declined to $22.6 million in 2014 and $7.4 million in 2015.

27.     **Increased Expenses Due to Brand Relaunch and Product Development -** In July 2014, the Debtor relaunched the NJOY brand, changed the packaging of its products and introduced new versions of the King, as well as new rechargeable e-cigarettes and vaping products.   At the same time, the Debtor launched its updated online selling platform.   In connection with the relaunch, the Debtor had to hire additional sales and marketing professionals and increase payment of third party commissions. The Debtor also significantly increased spending on programs to build brand awareness and marketing.

28.    **Government Regulation and Increased Legal Expenses** – On May 5, 2016, the FDA issued its final deeming rule to bring ENDS products within its authority under the Center for Tobacco Products.  The deeming rule went into effect on August 8, 2016.  Based on the deeming rule, manufacturers of these "newly deemed" ENDS products are required to, among other things: (a) register with the FDA and report product and ingredient listings; (b) only market new products (those not on the market as of the effective date) after obtaining pre-market approval from the FDA following a costly and complex approval process; (c) not distribute free samples; (d) include a health warning on the packaging and not make "reduced risk" claims unless the FDA confirms the claim by scientific evidence. While waiting for the FDA to issue its final rule, many states and local authorities issued their own regulations regarding these products, ranging from restrictions on where and how the products can be sold, taxation, flavor restrictions, advertising, licensing requirements, and internet sales restrictions.   NJOY has incurred substantial expenses in addressing and preparing for the proposed FDA regulations, and in addressing and complying with the numerous state and local laws.

29.    **Expenses Related to IP Litigation and Prosecution.** NJOY defended a substantial patent infringement lawsuit commenced in June, 2012, by Ruyan Investment (Holdings) Limited and its patent assignee, Fontem Ventures BV, respectively (the Fontem litigation is a consolidated action of three individual complaints).  The lawsuit, which implicated all of the Debtor's then-existing device products, required NJOY to incur significant legal expenses in the defense of the lawsuit and in maintenance of substantial patent reexamination proceedings directed at the asserted patents, before it was settled in November 2015 based on confidential settlement terms.  In the course of that litigation and reexamination proceedings, NJOY incurred attorneys' fees in excess of $2.5 million.

30.      **Limited Liquidity and Capital Resources** – As of August 25, 2016, the Debtor's principal source of liquidity was through its revolving credit facility with FLFC and through additional term loans provided by CGP Sotterra, and Homewood.  Historically, uses of cash have been for operating expenses, capital expenditures and working capital requirements. The Debtor has generated substantial operating losses since its inception.  As of June 30, 2016, the Debtor had an accumulated deficit of $234.4 million.  The Debtor has been operating under a cash preservation strategy since that time, selectively holding back vendor payments. As of September 16, 2016, Accounts Payable balance totaled $16,058,061.24.

31.      The Debtor subsequently hired Barclay's Capital Inc. ("**Barclays**") to act as investment advisor in January 2016.  In early 2016, Barclays explored the potential sale of the Debtor's business to strategic purchasers. To this end, Barclay's contacted thirty (30) potential purchasers.  While some parties expressed in interest in acquiring the Debtor's business and executed non-disclosure agreements, ultimately Barclay's received no offers.  Subsequently, in June 2016, Barclay's again market tested the Debtor's business by soliciting those parties who had previously expressed an interest in acquiring the Debtor's business. In total, Barclay's contacted twelve parties and five of those parties executed non-disclosure agreements to conduct due diligence, with two parties conducting substantial due diligence.

**First Day Motions**

32.      The Debtor filed the First Day Motions contemporaneously herewith to ensure that, subject to the financing provided by the proposed debtor-in-possession financing proposed hereinafter, the Debtor's business continues to function during the Case.  For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtor's business operations, (ii) operate with minimal disruption during the pendency of the Case, (iii)

maintain value as a going concern, and (iv) facilitate the efficient and economical administration of the Case. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[5]

### A. Notice and Claims Agent Application

33.     Prior to the selection of UpShot Services, LLC ("**UpShot**") as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from at three (3) other claims and noticing agents to ensure selection through a competitive process. I believe, based on all engagement proposals obtained and reviewed, that UpShot's rates are competitive and reasonable given UpShot's quality of services and expertise.

34.     In view of the number of anticipated claimants and the complexity of the Debtor's business, I believe that the appointment of UpShot as claims and noticing agent is both necessary and in the best interests of the Debtor's estate and its creditors.

### B. DIP Financing Motion

35.     In connection with the planning for this chapter 11 case, the Debtor and its advisors determined that the Debtor would require the DIP Financing to meet their ongoing liquidity needs pending the sale of substantially all its assets. Without such financing, the Debtor will not be able to liquidate in a manner that maximizes recoveries for creditors. The Debtor's ability to pay their employees and otherwise to finance its sale, is dependent on their ability to obtain and use the funds that would be made available under the DIP Financing Agreements.

36.     In addition to the DIP Financing, the Debtor also requires the use of the Prepetition Secured Lenders' Cash Collateral. The Agent has consented to the use of cash collateral. The proceeds of the DIP Facility, coupled with the use of Cash Collateral (consistent

---

[5]     Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

with the Budget) will provide the Debtor with the capital necessary to liquidate their assets in an orderly manner.

### C. Critical Vendor Motion

37.     The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay the prepetition claims of certain vendors that are critical to the Debtor's operations, as more fully described herein (the "**Critical Vendor Claims**") up to $100,000 on an interim basis and up to $220,000 on a final basis.

38.     The Debtors have a number of key relationships with vendors who provide essential goods and/or services (the "**Critical Vendors**").  The Debtors believe that if they cannot continue the relationships as a reorganized entity with the current Critical Vendors, it may be impossible to continue doing business.  In any event the amount of capital required to obtain similar goods or comparable services would be much greater than the combined total of making payment on the past due amounts to the Critical Vendors and the likely payment required for postpetition work.

39.     The Debtors believe that they must continue to receive the services provided by the Critical Vendors in order to achieve a successful reorganization.  In some cases, the Debtors believe that absent payment of prepetition amounts due Critical Vendors may refuse to deliver any goods and services on an on-going basis even if the Debtors can pay postpetition amounts due.

40.     Ultimately, the Debtors believe that their ability to continue operations at the efficient and high-quality levels needed to reorganize successfully will largely depend on the continued participation of the Critical Vendors.  The Debtors, along with their restructuring advisors, have performed an analysis of the Critical Vendor Payments necessary to avoid

potentially significant disruptions to the Debtors' business operations. The Debtors believe that a fund of $220,000 in the aggregate should provide the flexibility necessary for the Debtors to receive the vital goods and/or services they require to continue being successful as a reorganized entity.

### D. Bid Procedures and Sale Motion

41.      Through the Bid Procedures Motion, the Debtor seeks authority to market its assets to ensure that the Debtor obtains the highest or otherwise best offer for the Debtor's assets. If approved, the proposed bid procedures (the "**Bid Procedures**") will enable the Debtor to move expeditiously towards the best resolution of this case. As set forth in further detail in the Bid Procedures Motion, the Sale, the Bid Procedures, and the related relief requested in this Motion are in the best interests of the Debtor's estate and its stakeholders.

### E. Cash Management Motion

42.      In the ordinary course of its business, Debtor maintains a cash management system (the "**Cash Management System**"), which includes all activities necessary and pertinent to collecting and disbursing the Debtor's cash assets. The Cash Management System allows the Debtor to efficiently identify its cash requirements and transfer cash as needed to respond to these requirements. The Cash Management System is important to the efficient execution and achievement of the Debtor's business objectives, and, ultimately, to maximizing the value of the Debtor's estate.

43.      The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage their cash in a cost-effective, efficient manner.

44.    The Cash Management System consists of bank accounts (the "**Bank Accounts**"), which are maintained at Wells Fargo Bank, N.A. Exhibit B to the Cash Management Motion contains a list of all of the Debtor's Bank Accounts.  As discussed in greater detail below, the Debtor maintains one disbursement account through which the Debtor makes all of its disbursements and one operating account into which receives the Debtor's deposits.

### F.  Customs Motion

45.    The Debtor's business depends on the daily process of importing and shipping its products (the "**Merchandise**") to retail stores and for sale through the Debtor's website. Specifically, the Debtor's Merchandise is manufactured overseas and is shipped to various ports in the United States, cleared for customs, loaded onto railroad containers, and finally moved onto trucks, which transport the Merchandise to retail stores and customers. The Debtor is required to pay customs duty charges ("**Customs Duties**"), which charges the Debtor pays directly without the use of an outside broker. The Merchandise can be stopped in transit if Customs Duties are not paid in the ordinary course.

46.    As of the Petition Date, the Debtor estimates that approximately $70,000 is owed in the aggregate on account of prepetition Customs Duties. This amount includes both invoices that the Debtor has received, as well as amounts that the Debtor has not yet received, but are believed to have been incurred as of the Petition Date based on historical practice. Payment of the Customs Duties will avoid disruption in the Debtor's business, prevent the possibility stoppage of the Debtor's Merchandise at various ports, and enable the Debtor to realize the value of the Merchandise and continue its operations uninterrupted.

47.    Moreover, although the Debtor believes that the above aggregate amount of unpaid prepetition Customs Duties is accurate, to the extent that additional amounts are found to be

outstanding (most likely due to delayed invoicing or the timing of certain shipments), the Debtor must be able to pay such amounts in order to gain access to the Merchandise, as any disruption in the Debtor's movement of Merchandise could result in significant adverse consequences to the Debtor's business.

48.     I believe that it is imperative that the Debtor be authorized to pay the prepetition Customs Duties. Because the Debtor is bringing freshly manufactured products to market, any delay in those products being delivered to the Debtor's customers hinders the value of those products and, ultimately, the Debtor's ability to obtain the highest return for its stakeholders through this Case.

### G.  Wage Motion

49.     In the Wage Motion, the Debtor requests that the Court enter an order authorizing, but not directing, the Debtor, in its sole discretion: (a) to pay to the Employees all accrued prepetition wages, salaries, and other amounts described more fully below (collectively, the "**Employee Claims**"); (b) to honor any prepetition obligations in respect of, and to continue to honor in the ordinary course of business until further notice (but not assume), certain of the Debtor's paid time off, and holiday time policies, workers' compensation and employee and retiree benefit plans and programs, and employee agreement payments (collectively, the "**Employee Benefits**"), as described below; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtor in the ordinary course of business (the "**Employee Expenses**"); (d) to remit all related prepetition payroll taxes (the "**Payroll Taxes**") and other deductions (the "**Employee Withholdings**"); and (e) to the extent that any Employee Benefit is administered, insured, or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and

provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees (collectively with the Employee Claims, the Employee Benefits, the Employee Expenses, the Payroll Taxes, and the Employee Withholdings, the **"Prepetition Employee Obligations"**).

50.     The Debtor also requests an order authorizing the Banks to honor and process checks and electronic transfer requests related to the foregoing.

1.     Payroll and Ordinary Course Compensation

51.     The Debtor's workforce is comprised of full-time salaried employees, full-time hourly employees (collectively, the **"Full Time Employees"**) As of the Petition Date, the Debtor employs approximately 1 hourly Full Time Employee and 14 salaried Full Time Employees, for a total of 15 Full Time Employees. All of the Debtor's Employees are stationed in the following work locations: Scottsdale, Arizona (9); and (6) work remotely from the following states: AR, CA, MN, OH, VA, and WI.

52.     All Employees are paid every week on a Friday (the **"Pay Day"**). The Salaried Employees are paid for the 40 regular hours ending on the Pay Day and the Hourly Employees are paid one week in arrears to account for the hours worked through the Friday immediately preceding the Pay Day. Payroll to the Employees is funded in net to Paylocity (**"Paylocity"**), the Debtor's third-party payroll administrator, through ACH on the same day as the Pay Day; and Paylocity is responsible for distributing net pay to the Employees from its own accounts. The Debtor's most recent prepetition payroll date was September 16, 2016. It covered the pay period from September 11, 2016 through September 19, 2016 for Salaried Employees, and September 4, 2016 through September 10, 2016 for Hourly Employees. The total amount of the September 16, 2016 payroll was approximately $75,600.

The Debtor's next scheduled payroll date is September 23, 2016, and will cover the pay period from September 18, 2016 through September 24, 2016 for Salaried Employees and September 11, 2016 through September 17, 2016 for Hourly Employees. Consistent with the ordinary course of dealings between the Debtor and Paylocity, funds in respect of this pay period have not yet been withdrawn from the Debtor's accounts. The Debtor expects that postpetition, weekly payroll expenses through the first thirteen weeks of this Case will be in the range of approximately $624,000 (average pay period times number of pay periods in next 13 weeks), subject to any postpetition reduction in workforce.

53.      The Debtor's ability to maximize the value of the estate for all stakeholders depends on the expertise and continued enthusiasm and service of the Debtor's Employees. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the Employees may be adversely affected.  If the Debtor fails to pay the Employee Claims in the ordinary course, the Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses. This outcome would have a negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby causing immediate and irreparable harm to the Debtor and the estate.

54.      The Debtor believes that, as of the Petition Date, approximately $1,100.00 was earned but remains unfunded with respect to Employees on account of accrued prepetition wages and salaries. Pursuant to the Wage Motion, the Debtor seeks to pay the outstanding amounts owed to Employees as of the Petition Date for accrued and unfunded wages and salaries, in an amount not to exceed $2,000.00 in the aggregate.

55.     In addition, the Debtor occasionally contracts with additional workers, who are either independent contractors or employees leased from temporary placement agencies. As of the Petition Date, there are 4 additional workers. These individuals are compensated outside of the Debtor's payroll system, and receive, in the aggregate, approximately $24,400.00 per month. The additional workers are owed approximately $5,800.00 in respect of prepetition services.

56.     The Debtor seeks to continue to pay postpetition costs of the Employee Claims in the ordinary course during the pendency of the Case (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

57.     The Debtor pays Paylocity approximately $1,100.00 per month for its administrative services (the "**Payroll Processing Fee**"). The Payroll Processing Fee is funded concurrent with the funding of the payroll. As of the Petition Date, the Debtor believes that no amount is owed in respect of the Payroll Processing Fee. The Debtor seeks authority to pay any prepetition amounts owing to Paylocity in respect of the Payroll Processing Fee in an amount not to exceed $1,100.00 in the aggregate. The Debtor seeks authority to continue to make payments in respect of the Payroll Processing Fee postpetition in the ordinary course during the pendency of the Case.

2.  Paid Time Off

58.     Employees accrue paid time off to attend to personal needs that require time away from work such as for vacation, sickness or disability, family member sickness or disability, and other personal business ("**PTO**"). All Full Time employees receive three (3) weeks of PTO per year, which accrues at the rate of 2.31 hours per pay period (based on a weekly pay period).

59.     Accrued but unused PTO can be carried over into a subsequent calendar year, but stops accruing at a specific cap. Full Time employees do not accrue PTO once the

employee's PTO "bank" reaches 5 weeks (200 hours of PTO). Employees may continue to accrue PTO once their "banked" PTO hours fall below the employee's cap.

60.    The Debtor seeks authorization to continue the PTO policy and to honor, in the ordinary course of business, all unused PTO time accrued prior to the Petition Date, but not to make cash payments on account of accrued but unused PTO, except at separation of employment and where required by state law.

61.    Except as set forth in the following paragraph, the amount owed to any individual Employee on account of prepetition Employee Claims for such Employee's accrued wages, severance, and PTO does not exceed $12,475 and is not in respect of any time period more than 180 days before the Petition Date.

62.    Because of their long tenure with the Debtor, sixteen (5) non-insider Employees have prepetition claims that exceed $12,475 because of the amount of their accrued prepetition wages, PTO, and/or severance. [6] The Debtor does not seek authority to pay these Employees any amounts in excess of $12,475 on account of these prepetition claims.    One insider Employee has prepetition claims that exceed $12,475 on account of accrued prepetition wages, PTO, and severance.[7] The Debtor does not seek authority to pay these insider Employees any amounts in excess of $12,475 on account of these prepetition claims (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

3.  Employee Benefit Plans

---

[6]    The aggregate amounts of these non-insider Employees' prepetition claims are as follows: $25,867.45; $16,343.97; $14,475.89; $14,296.91; $13,628.83.    These aggregate amounts exclude the amount of any retention payments payable under the Employee Agreements, as discussed more fully above.  Any payments made in respect of these aggregate claims will be applied first to prepetition wages, then to any accrued prepetition PTO, and last to accrued severance.

[7]    The aggregate amount of the insider Employee's prepetition claim is as follows: $22,034.65

63.     Prior to the Petition Date, the Debtor offered Full Time Employees ("**Eligible Employees**"), various standard employee benefits (the "**Benefit Programs**") including, without limitation, (a) medical and prescription drug coverage, (b) dental insurance, (c) vision insurance, (d) COBRA coverage, (e) flexible spending accounts, (f) life insurance, (g) short-term and long-term disability insurance, and (h) certain paid holidays.  Such benefits are administered pursuant to plans, programs, and policies that cover the Debtor's Eligible Employees.  The amounts set forth below reflect the approximate prepetition cost of such Benefit Programs, which the Debtor seeks to continue in the ordinary course of its business. The Debtor expects that Benefit Programs going forward will be consistent with the following, subject to any reduction in cost as a result of the reduced workforce.

64.     *Medical Insurance Program.*  The Debtor offers a medical and prescription drug program (the "**Health Plan**") to Eligible Employees, which is administered by United Healthcare Services, Inc. ("**United**"). The Health Plan is approximately 85% paid by the Debtor and 15% paid by the Debtor's Eligible Employees through payroll withholding. Payments in respect of Health Plan premiums are remitted in full by the Debtor, and Employee contributions are subsequently recovered by the Debtor during the payroll process. The average monthly cost to the Debtor (without considering amounts paid from Employee withholding) of maintaining the Health Plan, has been approximately $26,000.00.  As of the Petition Date, the Debtor believes that no amount is owed in respect of the Health Plan.[8]  The Debtor seeks authorization to pay prepetition amounts in respect of the Health Plan in an amount not to exceed $26,000 in the aggregate. The Debtor seeks authorization to continue

---

[8] Debtor's Employee Benefit Plans run on an October 1 - -September 30 plan year.  On October 1, the plan premiums will increase by approximately 7.3%.  This applies to Health, Dental, Vision, Life and Disability.

to pay postpetition costs of the Health Plan in the ordinary course during the pendency of the Case.

65.     *Dental Insurance Program.*  The Debtor offers a dental program (the "**Dental Plan**") to Eligible Employees, which is administered by United. The Dental Plan is approximately 85% paid by the Debtor and 15% paid by the Debtor's Eligible Employees through payroll withholding. Payments in respect of Dental Plan premiums are remitted in full by the Debtor, and Employee contributions are subsequently recovered by the Debtor during the payroll process. The average monthly cost to the Debtor (without considering amounts paid from Employee withholding) of maintaining the Dental Plan, has been approximately $2,750.00. As of the Petition Date, the Debtor believes that no amount is owed in respect of the Dental Plan. The Debtor seeks authorization to pay prepetition amounts in respect of the Dental Plan in an amount not to exceed $2,750 in the aggregate. The Debtor seeks authorization to continue to pay postpetition costs of the Dental Plan in the ordinary course during the pendency of the Case.

66.     *Vision Insurance Program.*  The Debtor offers a vision insurance (the "**Vision Plan**") to Eligible Employees, which is administered by United. The Vision Plan is approximately 85% paid by the Debtor and 15% paid by the Debtor's Eligible Employees through payroll withholding. Payments in respect of Vision Plan premiums are remitted in full by the Debtor, and Employee contributions are subsequently recovered by the Debtor during the payroll process. The average monthly cost to the Debtor (without considering amounts paid from Employee withholding) of maintaining the Vision Plan, has been approximately $300.00. As of the Petition Date, the Debtor believes that no amount is owed in respect of the Vision Plan. The Debtor seeks authorization to pay prepetition amounts in

respect of the Vision Plan in an amount not to exceed $300.00 in the aggregate. The Debtor seeks authorization to continue to pay postpetition costs of the Vision Plan in the ordinary course during the pendency of the Case.

67.    Life, Disability, and Related Insurance Coverage.    The Debtor provides Eligible Employees with company-funded short-term and long-term disability insurance, accidental death and dismemberment insurance, and basic life insurance, which are all insured by Cigna (the "**Life and Disability Plans**"). The Debtor pays 100% of the costs of the Life and Disability Plans. In the aggregate, the average monthly cost to the Debtor of maintaining the Life and Disability Plans has been approximately $1,807. As of the Petition Date, the Debtor believes that no amount is owed in respect of the Life and Disability Plans. The Debtor seeks authorization to pay prepetition amounts in respect of the Life and Disability Plans in an amount not to exceed $1,807 in the aggregate. The Debtor seeks authorization to continue to pay postpetition costs of the Life and Disability Plan in the ordinary course during the pendency of the Case.[9]

68.    *COBRA*.    The Debtor seeks to continue to perform in the ordinary course any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("**COBRA**") in respect of Employees and their covered dependents whether terminated prior to or after the Petition Date. The former Employees pay 100% of the premiums for COBRA benefits (plus a 2% administration fee), and the Debtor therefore does not make any cash payments on account of COBRA benefits. Notwithstanding that Debtor does not pay for Employees' COBRA benefits, Debtor's request to continue

---

[9]    The Debtor also offers business travel accident insurance coverage for employees traveling on company business through Cigna.

premium payments for Health, Dental and Vision Benefits is also necessary so that terminated Employees who are eligible for and elect COBRA benefits will have a plan to pay into.

69.    *Supplemental Insurance*.  The Debtor offers Eligible Employees supplemental insurance administered by Cigna (the "**Supplemental Insurance**").  Employees pay 100% of the premiums for Supplemental Insurance via payroll withholding, and the Debtor therefore does not make any cash payments on account of Supplemental Insurance.

70.    *Flexible Spending Accounts*.  The Debtor offers Eligible Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan and for dependent claims.  The flexible spending benefits (the "**Flex Benefits**") are administered through a Third-Party Administrator BASIC. The Debtor pays for administration of the Flex Benefits plans (the "**Flex Benefits Fee**") as part of its administrative fee to BASIC which totals $200.00 per month. As of the Petition Date, the Debtor believes that no amount is owed in respect of the Flex Benefits Fee. The Debtor seeks authorization to pay prepetition amounts in respect of the Flex Benefits Fee in an amount not to exceed $200 in the aggregate. The Debtor seeks authorization to continue to pay postpetition costs of the Flex Benefits Fee in the ordinary course during the pendency of the Case. Additionally, United administers a health savings account through its preferred health care bank, Optum Bank.

71.    *Paid Holidays*.  The Debtor offers paid holidays for Full Time Employees in observance of both federal, and, in some cases, state holidays (the "**Paid Holidays**"). Employees are paid eight hours for Paid Holidays if they do not work on such holiday, or may apply the Paid Holiday to a different day if the employee works on such holiday.  As of the Petition Date, the Debtor believes that no amounts are owed to Employees in respect of

Paid Holidays.  The Debtor seeks authorization to continue to pay postpetition costs of the Paid Holidays in the ordinary course during the pendency of the Case.

72.    *Bereavement Leave*.  The Debtor offers three days with pay when a death occurs in an employee's immediate family for the employee to attend the funeral or make funeral arrangements ("**Bereavement Leave**").  As of the Petition Date, the Debtor believes that no amounts are owed to Employees in respect of Bereavement Leave.  The Debtor seeks authorization to continue to pay postpetition costs of Bereavement Leave in the ordinary course during the pendency of the Case.

73.    *Honoring Prepetition Benefits*.  As of the Petition Date, certain of the Benefit Programs described above may remain unpaid or not yet provided because certain obligations of the Debtor under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of this Case, but will not be required to be paid or provided in the ordinary course of the Debtor's business until a later date.  The Debtor seeks authority to pay or provide as they become due all amounts in respect of the Benefit Programs described above that have already accrued, subject to the caps set forth herein.

74.    *Continuation of Benefits Programs Postpetition*.  The Debtor also requests confirmation of its right to continue to perform its obligations with respect to these Benefit Programs in the ordinary course for the duration of the Case.  These programs are an important component of the total compensation offered to the Employees, and are essential to the Debtor's efforts to maintain Employee morale and minimize attrition among those Employees whose retention is important for the Debtor's success.  The Debtor believes that the expenses associated with honoring such programs are reasonable and necessary in light of the potential

attrition, loss of morale, and loss of productivity that would occur if such programs were discontinued.

4. Workers' Compensation Program

75.     Under the laws of various states, the Debtor is required to maintain workers' compensation insurance to provide its Employees with coverage for injury claims arising from or related to their employment with the Debtor.  The Debtor maintains a workers' compensation benefits program through Aon, through its Third-Party Administrator AIG (the "**WC Program**").  The WC Program provides benefits to all of the Debtor's Employees for claims arising from or related to the Employee's employment with the Debtor.  The premium for the WC Program is paid on a monthly basis, and is approximately $2,500.00.  As of the Petition Date, the Debtor believes no amount is owed in respect of the WC Program. The Debtor seeks authorization to pay prepetition amounts in respect of the WC Program in an amount not to exceed $2,500 in the aggregate.  The Debtor seeks authorization to continue to pay postpetition costs of the WC Program in the ordinary course during the pendency of the Case.

5. Retirement Savings Program

76.     The Debtor maintains a 401(k) plan (the "**Retirement Plan**"), administered by Arizona Technology Counsel through its third-party administrator Slavic, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future.  The Retirement Plan is funded by Employee contributions, which are deducted by Paylocity from the Employee's payroll and remitted to the 401(k) Plan, and by Debtor "safe harbor" contributions, by which Debtor contributes to the participating Employee's accounts by contributing a 100% match of the Employee's deferral contributions up to the first 3% of the Employee's compensation, and a 50%

match of the next 2% of the Employee's contribution. The Debtor believes that maintaining the Retirement Plan is important to maintaining Employee morale.

77.     The Debtor maintains a 401(k) plan (the "Retirement Plan"), administered by Arizona Technology Counsel through its third-party administrator Slavic, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future.   The Retirement Plan is funded by Employee contributions, which are deducted by Paylocity from the Employee's payroll and remitted to the 401(k) Plan, and by Debtor "safe harbor" contributions, by which Debtor contributes to the participating Employee's accounts by contributing a 100% match of the Employee's deferral contributions up to the first 3% of the Employee's compensation, and a 50% match of the next 2% of the Employee's contribution. The Debtor believes that maintaining the Retirement Plan is important to maintaining Employee morale. The Debtor seeks authority to continue to make payments in respect of the Retirement Savings Program postpetition in the ordinary course during the pendency of the Case.

8.  Employee Expenses

78.     Prior to the Petition Date, the Debtor directly or indirectly reimbursed Employees for certain expenses incurred on behalf of the Debtor in the scope of their employment (the "**Employee Expenses**"). The Employee Expenses are incurred in the ordinary course of the Debtor's business operations and include, without limitation, expenses for meals, travel, lodging, and other business-related expenses. Historically, approximately $28,000.00 has been paid by the Debtor on account of Employee Expenses each month. Because a delay often occurs between the time such expenses are incurred and the time an expense reimbursement request is submitted, it is difficult to determine with precision the

aggregate amount of outstanding Employee Expenses. However, the Debtor estimates that, as of the Petition Date, approximately $5,800.00 in Employee Expenses remain unpaid.

79.     Absent authority to pay the Employee Expenses incurred prepetition, the Debtor's Employees could be obligated to pay such amounts out of their personal funds, which would be unfair and would hurt morale, likely resulting in Employee turn-over or performance issues that would cause immediate and irreparable harm to the Debtor and the estate. The Debtor therefore seeks authority to pay outstanding prepetition Employee Expenses in an amount not to exceed $28,000 in the aggregate, and to continue the foregoing policy in the ordinary course during the pendency of the Case.

9.  Employee Withholdings and Payroll Taxes

80.     The Debtor's payroll administrator, Paylocity, routinely deducts certain amounts directly from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("**FICA**") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs, and other similar programs.

81.     The Debtor is responsible for remitting to Paylocity, for its own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("**Payroll Taxes**"). The Debtor has paid approximately $19,000.00 in the aggregate for employer-obligated Payroll Taxes each month. The Debtor seeks authority to deduct and remit Payroll Taxes, in an amount not to exceed $19,000 in the aggregate, and to continue to deduct and remit the Employee Withholdings and to remit the Payroll Taxes in the ordinary course during the pendency of the Case.

### H. Customer Programs Motion

82.     Prior to the Petition Date, in the ordinary course of business, the Debtor engaged in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain a positive reputation for their goods in the marketplace and (ii) designed to attract new customers and to enhance loyalty and sales among the Debtor's existing customer base. These customer-targeted practices (collectively, the "**Customer Programs**") include, but are not limited to, those practices described in the following paragraphs.

83.     <u>Sales Promotions</u>. From time to time, the Debtor conducts sales promotions (the "**Sales Promotions**") including, among other things, discounts in which a customer receives a discount off a future purchase when the customer purchases a certain value in goods and weekly promotional pricing. To preserve the goodwill of their customer base, the Debtor seeks authorization to honor these Sales Promotions.

84.     <u>Coupons</u>. The Debtor maintains a coupon or promotional redemption program pursuant to which it honors its own promotional coupons or coupon codes for sales at retail stores (collectively, the "**Coupons**"). To preserve the goodwill of their customer base, the Debtor seeks authorization to honor the Coupons issued prior to the Petition Date in a manner consistent with their ordinary business practices.

85.     <u>Returns, Refunds, Exchanges</u>. Consistent with industry practice, the Debtor has traditionally maintained return, refund, and exchange policies. Certain customers also hold contingent claims against the Debtor for potential refunds, returns and exchanges (collectively, the "**Refunds**") relating to goods sold to customers prior to the Petition Date. Historically, if a customer is not satisfied with the merchandise after the purchase, the customer has the option to return or exchange the goods, or return or exchange goods through its websites and appropriate

distribution and fulfillment centers with a receipt, within 30 days after the purchase date. In addition, the company has agreements with certain wholesalers and retailers that allow the parties to return unsold over over-inventoried product in exchange for cash or credit for future purchases. Ascertaining with precision an estimate of the aggregate amount of requests for Refunds for merchandise purchased prior to the Petition Date is difficult. The Debtor estimates that the outstanding pre-petition customer refund liability is approximately $360,000. The Debtor seeks authority to maintain the Refund and Exchange policy.

86.    Commissions. The Debtor provides an affiliate program (the "**Affiliate Program**") whereby third parties who have a website or blog may earn commission for every qualified buyer that purchases the Debtor's products. Third parties who participate in the Affiliate Program will provide a link on their website that will direct viewers to the website and may purchase products from the Debtors. The Debtor pays a variable commission based on sales attributable to the Affiliate Program. As of the Petition Date, the Debtor estimates that approximately $37,544.04 is due on account of obligations incurred prepetition in connection with the Affiliate Program. The Debtor seeks authority to maintain the Affiliate Program.

1.    Credit Card Processing. The Debtor is party to certain agreements with credit card companies and processors pursuant to which the Debtor is able to accept credit card and debit card payments, subject to certain adjustments, returns, promotional fees and refunds. The Debtor has an agreement with Vantage Gateway and Best Rate governing the processing and authorization of Visa, MasterCard, and Discover transactions. Additionally, the Debtor is party to agreements with American Express, which provide for the settlement of transactions through those cards.

2.      Approximately 29% of the products sold are purchased with credit cards, and the Debtor's continued ability to honor and process credit card transactions are essential to the Debtor's business operations. Without this ability, the Debtor would lose a major method for conducting sales transactions. Under the terms of its agreements, the Debtor is required to pay the credit card companies and processors fees for its services, certain amounts of which may have accrued but remain unpaid as of the Petition Date.

3.      During the twelve month period ending in June 30, 2016, the Debtor paid on account of credit processing and related fees, approximately $190,000. As of the Petition Date, the Debtor estimate that approximately $2,000 is owed in prepetition fees to credit card companies and processors.

4.      Under the Debtor's agreements relating to the processing of credit cards, upon a customer's return of merchandise purchased using a credit card, the Debtor is obligated to refund to the card processor the purchase price of the returned merchandise plus certain adjustments (collectively, the "**Chargebacks**"). Generally, the Debtor's Chargeback obligations are satisfied by a reduction of payments currently owing to the Debtor under the processing agreements in the amount of the outstanding Chargebacks.

5.      It is possible that certain Chargebacks incurred by the Debtor immediately prior to the Petition Date may not have been fully netted out against credit card payments the Debtor received prior to the Petition Date. The Debtor seeks authority to pay all Chargeback obligations, and to continue to pay any Chargebacks along with the other fees related to Credit Card Processing.

87.      The ability of the Debtor to maximize the value of its inventory for the benefit of its creditors and stakeholders is dependent upon the patronage of its customers. In this regard, the

Debtor's Customer Programs and Credit Card Processing are critical, and any delay in honoring the Debtor's obligations could severely disrupt the Debtor's operations. The Debtor's failure to honor prepetition customer obligations or inability to process credit card transactions (the "**Customer Obligations**"), for even a brief time, may well drive away valuable customers, harming the Debtor's efforts to maximize the value of its inventory. Accordingly, I believe that the Debtor must be authorized to continue the Customer Programs and Credit Card Processing.

## I.  Insurance Motion

88.     The Debtor seeks entry of an order (i) authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "**Insurance Policy Obligations**"), and (b) continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtor's insurance premium financing programs (each, a "**Financed Program**" and, collectively, the "**Financed Programs**"), or enter into new premium Financing Programs, as necessary, in the ordinary course of business and pay prepetition obligations in respect thereof.

89.     In connection with its business operations, the Debtor maintains multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtor operates and various contractual obligations. The Insurance Policies include (a) general liability, (b) automobile liability and automobile physical damage, (c) umbrella liability, (d) excess liability, (e) cargo, (f) property, (g) foreign package, (h) flood, (i) directors and officers liability, (j) employment practices liability, (k) employment practices liability, (l) fiduciary liability, (m)

commercial crime, (n) special crime, (o) premises environmental liability, and (p) workers' compensation and employers' liability.

90.     The total annual premiums under the current Insurance Policies are approximately $1,115,240, including all related fees and charges. These premiums are paid to the relevant Insurance Carriers through the Financing Agreement (defined below).

91.     The Debtor does not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies.  In an abundance of caution, the Debtor seeks authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $50,000, and to continue to pay postpetition costs with respect to the Insurance Policies in the ordinary course of business during the pendency of this Case.

92.     The Debtor's insurance premiums are financed. The Debtor finances its premiums, other than premiums for workers' compensation insurance and directors and officers insurance, because it is not economically advantageous for the Debtor to pay those premiums in full on a lump-sum basis.  The Financed Programs are financed pursuant to an insurance premium financing agreement (the "**Financing Agreement**") with AFCO.  Under the Financing Agreement, the Debtor made a down payment of $126,362. The Debtor is obligated to make monthly payments of approximately $18,000 on the 12th of each month in advance for that month. The Debtors have made 1 of their 10 payments under the Financing Agreement and are current on their obligations thereunder.  The Debtor was obligated to make a payment of approximately $78,000 on September 12, 2016.

93.     In connection with the procurement and maintenance of their Insurance Policies, the Debtor obtains brokerage services from Cottingham & Butler (the "**Broker**"). The Broker assists the Debtor in obtaining comprehensive insurance for the Debtor's operations by, among

other things, assisting the Debtor's with the procurement and negotiation of the Insurance Policies, and enabling the Debtor to obtain those policies on advantageous terms and at competitive rates. The Debtor owes the Broker approximately $22,500 in the aggregate on an annual basis for its services (the "**Brokerage Fees**"). The Debtors seek authority to pay any prepetition amounts in respect of the Brokerage Fees, in an amount not to exceed $22,500, and to continue to pay postpetition costs with respect to the Brokerage Fees in the ordinary course of business during the pendency of these Cases.

94.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtor's assets and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtor's business operations. Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. If the Debtor fails to perform its obligations under the Insurance Policies and Financed Programs, their coverage thereunder could be voided. The Debtor may also need to renew or replace certain of the Insurance Policies and Financed Programs during the course of this Case, or enter into new policies. If the Debtor does not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

95.     Similarly, continuing to perform under the Financing agreements on a postpetition basis is in the best interests of the Debtor's estate. Moreover, given the Debtor's current financial circumstances, the Debtor may have difficulty securing alternative premium financing on terms as favorable as under the Financing Arrangements. In any event, the Debtor is highly unlikely to obtain such financing on an unsecured basis. Thus, the Debtor's ability to continue performing under and renew the Financing  Agreements is likely to preserve estate

value. In addition, if the Debtor was unable to continue honoring their obligations under the Financing Agreements, AFCO may seek relief from the automatic stay to terminate the Financed Programs which, if granted, would require the Debtor to obtain replacement insurance on an expedited basis and likely at greater costs for the Debtor. Even if the Financed Programs were not terminated, any interruption in the Debtor's payments could adversely affect the Debtors' ability to finance premiums for future policies.

96.     For the reasons already set forth herein and in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtor, for the Debtor to operate its business without interruption, and to preserve value for the Debtor's estate.

### J.  Taxes Motion

97.     The Debtor requests that the Court authorize (a) the Debtor to pay certain prepetition taxes, including, sales and use taxes, property taxes, franchise taxes, and similar taxes and fees in the ordinary course of business, as the Debtor, in its sole discretion, deems necessary, and (b) authorize the banks and financial institutions at which the Debtor's bank accounts are maintained (the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing.

98.     In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including sales, use, personal property, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (the "**Taxes and Fees**"). The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "**Taxing Authorities**") in connection with the operation of its business and the sale of products. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to

the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtor estimates that it owed approximately $50,000.00 in unremitted Taxes and Fees, all of which is comprised of current tax obligations.

99.     The Debtor seeks authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities; provided that payments on account of Taxes and Fees that accrued, in whole or in part, prior to the Petition Date but were not in fact paid or processed prior to the Petition Date shall not exceed $50,000 in the aggregate.

100.    Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole and on the value of its estate.  Specifically, the Debtor's failure to remit the Taxes and Fees could adversely affect the Debtor's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or seek to prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of the estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtor does not pay the Taxes and Fees; and (d) certain of the Debtor's directors, officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to the Case.

101.    Further, the Debtor's payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to maximize the value of the Debtor's estate for the benefit of creditors.  The Debtor operates an international business, and any disputes that could adversely affect its ability to conduct business in a particular jurisdiction could have wide-ranging and negative effects on the Debtor's operations as a whole and its efforts to efficiently administer the estate and maximize distributions to its creditors.  If the Debtor does not continue paying the Taxes and Fees when they come due on a timely basis, it is possible that Taxing Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtor's business and the efficient administration of the estate.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: September  16 , 2016

_____

Jeffrey Weiss
Interim President and General Counsel,
NJOY, Inc.