**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NJOY, INC.,[1] | Case No. 16-12076 (CSS) |
| Debtor. | Related to D.I.s: 18 and 32<br>Objection Deadline: October 5, 2016 at 5:00 p.m.<br>Hearing Date: October 7, 2016 at 10:00 a.m. |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL, OR A SUBSET, OF THE DEBTOR'S ASSETS, (B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF (C) SCHEDULING AN AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTOR AND PURCHASER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL, OR A SUBSET, OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (D) GRANTING THE RELATED RELIEF [D.I. 18]**

The Official Committee of Unsecured Creditors (the "Committee") of NJOY, INC., the above-captioned debtor and debtor-in-possession (the "Debtor") by and through its proposed undersigned counsel Fox Rothschild LLP, hereby objects (the "Objection") to the *Debtor's Motion for Entry of (I) An Order (A) Approving Bid Procedures in Connection With The Sale of Substantially All, or a Subset, of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) An Order (A) Approving the Asset Purchase Agreement Between the Debtor and Purchaser, (B)*

---

[1] The last four digits of the Debtor's federal tax identification number are 6013. The Debtor's mailing address and principal place of business is 15211 N. Kierland Blvd., Suite 200, Scottsdale, Arizona 85254.

*Authorizing the Sale of Substantially All, or a Subset, of the Debtor's Assets Free and Clear of*

*Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of*

*Contracts and Leases, and (D) Granting the Related Relief* [D.I. 18] (the "Bid & Sale Motion").[2]

In support of its Objection, the Committee respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.      The Committee is not opposed to a sale of the Debtor's assets in this Bankruptcy

Proceeding.  Nevertheless, any sale that is proposed and that may eventually occur must comport

with the applicable sections of the Bankruptcy Code.  Accordingly, any sale must be conducted

in a manner designed to achieve the highest and best offer, and must provide a benefit to the

Debtor's estate.  Otherwise, FLFC Lending Co. ("DIP Lender" or "Agent") is free to apply for

stay relief and if granted, foreclose on its collateral as guided by State law.  For the following

reasons, the Bidding Procedures and attendant sale proposed by the Debtor in this case fail to

comport with the Bankruptcy Code and should not be sanctioned by this Court.

2.      First and foremost, based on what the Committee has seen thus far, the potential

sale contemplated appears to be an insider transaction.  Initially the Debtor made no disclosure of

insider participation.  However, after both the United State Trustee and the Committee raised the

issue, the Debtor confirmed insider involvement on the eve of the Committee's objection

deadline to the Bid & Sale Motion.  As confirmed by the Debtor in its supplemental disclosure,

***holders of over 65% of the Debtor's equity either have the ability to credit bid pursuant to the***

***Bid & Sale Motion or are participating in the DIP Financing.***  Because the Committee was

appointed only approximately ten days prior to the date set for the hearing on the Bid & Sale

Motion, it has been unable to perform any meaningful investigation into the apparent insider

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bid & Sale Motion.

status of the parties who stand to benefit from the Bid & Sale Motion or who are participating in the DIP Financing. Accordingly, the Committee suggests that it may be appropriate to adjourn the Hearing on the Bid & Sale Motion and the DIP Financing Motion until it has had a chance to engage in discovery and negotiations with the parties at interest in this case. To the extent discovery and negotiations are not permitted to occur or cannot be successfully concluded, the Bid & Sale Motion should be denied.

3.     The proposed Bid Procedures and eventual sale make one thing abundantly clear: the Debtor's strategy for this case is to benefit insiders by ensuring a quick sale to the insider Purchaser, most likely through a credit bid. Despite Barclays' (Debtor's prepetition investment bankers) attempts to obtain a buyer twice this year, in January and again in June, the Debtor champions an expedited sale process. This time, the Debtor has retained CohnReznick Capital Market Securities LLC ("CRCMS") as its investment banker. However, the Debtor has failed to establish that any financial exigency exists for the hyper-accelerated sale process it proposes. Simply stated, the bid procedures fail to provide the requisite notice and ability to provide meaningful bids to other potential bidders who might maximize the value of the sale to the bankruptcy estates, and otherwise hinders their efforts to participate in any auction. It is a *fait accompli* that the Sale process as proposed in the Bid Procedures will result in the DIP Lender and insiders being made whole and the Debtor's unsecured creditors and other stakeholders will be left with nothing.

4.     Second, the Bid & Sale Motion, evidences the Debtor's intent to chill the bidding and to approve a quick sale to the DIP Lender and insiders. As more fully explained below, the timing, bid protections, and provisions for credit bidding are designed not to encourage but

3

indeed, chill competitive bidding.  For this additional reason, the Bid Procedures must not be approved.

5.      Third, approval of the Bid Procedures in conjunction with the failure of the Agent and DIP Lender to provide a fund for the reasonable administrative expenses of this case will leave unsecured creditors with no prospect for recovery, will likely result in the administrative insolvency of the Debtor's estate after the Sale, and will ensure a whitewash of the chapter 11 case and a "purchase" of the assets by insiders of the Debtor or affiliates of such insiders.

6.      There is insufficient information provided by the Debtor to determine whether the proposed transaction is fair, whether the purchase price is reflective of the value of the Debtor's assets or whether the sale is proposed in good faith.

7.      The Bid & Sale Motion should be denied or at the very least, amended, because the evidence demonstrates the proposed bid procedures are not proposed in good faith, are designed to prevent a robust auction, and will make the ascension of the DIP Lender/insider Purchaser to ownership of the Debtor's a foregone conclusion.

8.      The Committee submits that this process should be extended to no less than ninety (90) days from approval of the bid procedures.  This additional time will allow bidders to conduct due diligence, obtain financing commitments and prepare qualified bids for an auction.

9.      Finally – and although not squarely before the Court at this time – the Bid Procedures must be denied because the Bid & Sale Motion itself cannot be approved.  Courts have routinely denied bid procedures where the sale process is flawed and the eventual sale cannot be approved.

42564523

## II.    BACKGROUND

10.    On September 28, 2016, the United States Trustee appointed the Official Committee of Unsecured Creditors in this Case [D. I. 64].  The Committee has selected Fox Rothschild LLP as its counsel.

11.    As of the Petition Date, the amount owed under the Revolver was approximately $3.2 million, the amount owed under the Term Loan was approximately $9.6 million, and the amount owed under the second lien convertible notes was approximately $14.7 million.[3] Declaration of Jeffrey Weiss in Support of First Day Motions (the "Weiss Declaration") ¶ 23.

12.    Each loan is allegedly secured by substantially all of the Debtor's assets.  Weiss Declaration at ¶ 22.

13.    On September 19, 2016, just the second business day into the case, the Debtor filed the Bid & Sale Motion, seeking to establish Bid Procedures for the sale of substantially all of its assets, and seeking Court approval of such Sale.

14.    Pursuant to the Bid & Sale Motion and Bid Procedures, the Debtor has proposed the following sale timeline:

>    (a) Bid Deadline:        October 28, 2016
>
>    (b) Auction:             October 31, 2016
>
>    (c) Sale Hearing         no later than November 10, 2016;
>
>    (d) Closing Date:        no later than November 15, 2016.

See Bid & Sale Motion , ¶¶ 14-15;  Ratification and Amendment Agreement, D.I. 36-1, section 5.4.

---

[3] It is unclear exactly what is owed on the Revolver, and Term Loan and the Subordinate Convertible Note as the Declaration of Jeffrey Weiss and the Interim DIP Order are inconsistent.

42564523

15.     Pursuant to the Ratification and Amendment Agreement, the DIP Agent has the right to credit bid the amount of its "Revolving Obligations" as defined in the DIP Motion.

16.     Thus, if this Court approves the Bidding Procedures on October 7, 2016 – Qualified Bids are due within twenty-one (21) days – October 28, 2016 – in order to have any possibility of complying with the Sale Process Deadlines.   Twenty-one (21) days is an unreasonable amount of time for (i) the Debtor to market and solicit competing bids from prospective purchasers; (ii) prospective bidders to conduct due diligence; and (iii) prospective bidders to submit Qualified Bids.   As the Court and parties are likely well aware, often times potential purchasers do not get serious about submitting bids until after a process has been established by the Bankruptcy Court.   However, the requested bid time-line leaves little time for potential bidders to get involved.   Moreover, the Debtor has given no justification for such an expedited time frame, other than the illusory basis that the Debtor's lack of cash (this is discussed in more detail below).   In light of the fact that the Debtor has represented that it just ran a process twice in the last six months, under this abbreviated schedule, the Committee submits that it is a foregone conclusion that the Agent's credit bid will be the winning (and only) bid.   Again, the fact that the Debtor may have run two prepetition sale processes is unpersuasive because acquisition of a company like the Debtor will always be more attractive in bankruptcy – a fact clearly contemplated by the DIP Lender and insiders here.   So this sale process needs to be treated as starting at ground-zero, which leads to only one conclusion: the time-frame proposed by the Debtor and DIP Lender is wholly inadequate.

### III.    OBJECTIONS

**A.    Approval of Bidding Procedures.**

17.    Sales of assets of the bankruptcy estate outside the ordinary course of business is authorized by 11 U.S.C. § 363(b)(1) of the Bankruptcy Code, which provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." However, a bankruptcy court is empowered to approve sales outside of the ordinary course of business pursuant to 11 U.S.C. § 363(b)(1) only when there is some business justification for the proposed sale. *In re Encore Healthcare Assoc.*, 312 B.R. 52, 55 (Bankr. E.D. Pa. 2004); *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).

18.    Moreover, sales to insiders and other fiduciaries must be subjected to heightened scrutiny – most importantly where the proposed sale will not yield any recoveries to any party other than another insider. *See In re Broadstrip*, 444 B.R. 51, 79 (Bankr. D. Del. 2010).

19.    Although §363 sales are beneficial because they may occur on an expedited basis, "[t]he need for expedition . . . is not a justification for abandoning proper standards." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968). Thus, the bankruptcy judge "must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel*, 722 F.2d at 1071. Thus, "a debtor applying under §363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization." And "an objectant . . . is required to produce some evidence respecting its objections." *Id.*

7

20.     The paramount goal in any proposed "transaction", such as a sale of property of the estate, is to maximize the proceeds received by the estate for the benefit of creditors.  *See In re Mushroom Trans. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").  *See also In re Hart's Mfg. Co., Inc.*, 383 B.R. 720, 724 (W.D. Tenn. 2008) ("…one of the primary aims of the sale confirmation process is to maximize creditor recovery by looking to whether the sale is in the best interests of creditors.") (citations omitted).

21.     To that end, courts will approve bid procedures when they are designed to maximize the value of the estate.  *In re Calpine Corp. v. O'Brien Envl. Energy, Inc. (In re O'Brien Envl. Energy)*, 181 F.3d 527, 535-37 (3d Cir. 1999); *In re Dura Auto Sys., Inc.*, Case No. 06-11202, 2007 WL 7728109 at *90 (Bankr. D. Del. Aug. 15, 2007) ("Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets").  Bidding procedures in connection with bankruptcy sales or auctions should enhance competitive bidding.  *See Id*.

**B.     The Bid Procedures Are Not Designed To Maximize The Value Of The Assets, and Therefore Must Not Be Approved.**

**1.     The Sale Process Should Be Extended To 90 Days.**

22.     As a general matter, §363 sales held on an expedited basis, such as the timetable proposed in the Bid Procedures, are disfavored.  Courts are "extremely concerned by this time-trap," which is "inconsistent with the Code, due process of law, the exercise of the courts authority and simple common sense."  *In re Bombay Company, Inc.*, No. 07-44084-rfn-11, 2007 WL 2826071, at *3 (Bankr. N.D.Tex. Sept. 26, 2007).  Thus, "[a]t a minimum, if section 363(b)(1) is the means for effecting the debtor's disposition, the creditors should have the luxury of enough time for their representative to assess fully the proposed transactions."  *Id*. at *4; *see*

8

*also In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."); *In re Humboldt Creamery, LLC*, No. 09-11078, 2009 WL 2820610, at *2 (Bankr. N.D.Cal. Aug. 14, 2009)(stating that in such expedited §363 sales, "the judge is reduced to a figurehead without any meaningful discretion and might as well leave his or her signature stamp with the debtor's counsel and go on vacation or shift attention to consumer cases where the law may still mean something"); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 420-21 (Bankr. S.D.Tex. 2009)(discussing §363 sales, and stating that "[t]he lack of transparency, the pace of the process, and the inconsistent treatment by the courts . . . leave the bankruptcy courts and parties in interest vulnerable to unfair dealing, abuse, and sweetheart deals")(internal citations omitted).

23.     With no apparent exigency or other reason for an expedited sale, the Debtor proposes a 30 day timetable for the entire sale process which will detract from competitive bidding and will not maximize the value of the Debtor's estate for the benefit of its creditors. Rather, the proposed truncated Sale process will have a chilling effect on bidding at any auction and is designed for the sole purpose of benefitting the Purchaser parties, comprised of the DIP Lender and parties related to and affiliated with the Debtor.  The Purchaser parties have ulterior economic motives in this bankruptcy case and without full disclosure of all of the facts and circumstances surrounding the negotiations and transactions which led to the proposed Sale, there is no substantial business justification for the expedited timetable for the Sale Process.

24.     The Committee fully expects the Debtor and Agent to offer inadequacy of cash resources as a purported justification for the truncated sale timelines.  This justification rings

42564523

hollow.  First, conclusory statements on time being of the essence have no weight and provide no justification to usurp the Bankruptcy Code's mandate of a robust marketing effort.  Second, while the Debtor will insist that the truncated time period is necessary given it "does not have sufficient cash resources or committed financing to operate its business and service ordinary course obligations for an extended period of time" – the Agent and DIP Lenders have already agreed to a sale process in bankruptcy.  As such, the Agent must understand that in order to receive the extraordinary protections afforded by sales in bankruptcy proceedings, it must "pay the freight."  *See Encore Health Assoc.*, 312 B.R. at 57, n. 10 ("[r]ecognizing as much, most secured creditors understand the necessity of making some distribution available to other creditors as the price of a court approved sale.").  It is illusory for the Debtor and DIP Lender to argue lack of cash resources when they are the parties that set up and control the process.   The DIP Lender and insider purchasers' truncated time-table for the Sale Process is a "time-trap" and should not be allowed.

        **2.**        **The Sale Is Not Proposed In Good Faith.**

25.    "[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser."  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).  The Debtor has not satisfied the requirements for proposing a sale under § 363(b) because, given the circumstances surrounding the sale, it has failed to rebut strong inferences that the sale is not taking place in good faith.

26.    The present case presents precisely the type of situation to which courts object—where a debtor seeks the approval of bid procedures on an expedited basis notwithstanding the

fact that it has been in financial trouble for some time, likely for the purpose of appeasing the purchaser, who in this case is related to the ultimate owner of the Debtor and the DIP Agent.

27.    "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

28.    In similar cases, bankruptcy courts have found that section 363 sales whose sole effect was to benefit insiders of the debtor or others whose motives were suspect were not proposed in good faith and could not be approved.  *See e.g.*, *In re Cloverleaf Enters.*, 2010 WL 1445487 at *3-4 (Bankr. D. Md., April 2, 2010) (where unsecured creditors were unlikely to benefit from debtor's proposed sale which failed to provide valuation for real estate and would "only produce funds to pay a portion of the administrative expenses" and a "small portion of the unsecured claims," the court found that the debtor's proposed sale "primarily benefits its sole shareholder . . . while providing woefully inadequate notice . . . to all other parties"); *In re Gulf Coast Oil Co.*, 404 B.R. at 426 (noting that "bankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the secured lender" and denying the sale motion where "[t]he only effect . . . would be to transfer the debtors' assets to is secured creditor with benefits that the creditor could not achieve through foreclosure").

29.    The Debtor's financial troubles have been ongoing since at least 2014.  See *Weiss Declaration*, ¶ 26.  There are no exigent circumstances that warrant a truncated sale process. Given the expedited timetable proposed by the Debtor for the Sale process, the Committee is left

with the impression that the Purchaser is attempting to take grossly unfair advantage of other potential bidders and stakeholders, the Chapter 11 process and the Debtor's estate.

30.    Likewise, in this case the Debtor has provided no information about the value of the assets being sold or the negotiation between the Debtor and any potential buyer. Consequently, without disclosure of this information to all interested parties and a reasonable time period for the marketing of the Debtor's Assets for sale, the Bid & Sale Motion should be denied.

**3.    The Schedule Of The Proposed Sale Does Not Provide Adequate Notice to Potential Purchasers.**

31.    The truncated time table proposed by the Debtor for the Sale Process Deadlines in the Bid & Sale Motion is inadequate to provide notice to other potential bidders.  "For a Chapter 11 preconfirmation sale of all or substantially all of a debtor's assets, appropriate notice should be a functional substitute for the adequate information which would be contained in a disclosure statement concerning the proposed transaction." *In re Naron & Wagner, Chartered*, 88 B.R. 85, 89 (Bankr. D. Md. 1988).  "When assets are sold immediately after the case is filed, the court can have very little confidence that all parties in interest have adequately organized, have received adequate notice, have obtained appropriate information, and have been able to participate in the proceedings. . . . Proposals for quick sales, understood by only a few parties who would benefit from the sale, are inherently suspect." *In re Gulf Coast Oil Corp.*, 404 B.R. at 423-24.

32.    Although the Bid & Sale Motion was filed by the Debtor shortly after the Petition Date, the Affidavit/Declaration of Mailing provides that the notice was served on only sixty-three recipients.  [D.I. 57].  Pursuant to the Weiss Declaration, Barclays solicited thirty (30) potential buyers and five parties executed non-disclosure agreements.  Weiss Declaration, ¶ 31. No indication is made in the Bid & Sale Motion whether these parties have been made aware of

the current sale and auction process.  Thus, the Committee has serious doubts that the noticing procedures employed to market the Debtor's assets in bankruptcy was as effective as it might otherwise have been.  The absence of notice to potential bidders can lead to only one result – no qualified bids and the ascension of the DIP Lender/Pre-Petition Lenders/insiders as the winning bidder – exactly what the Debtor's Bid Procedures were designed to accomplish.  Furthermore, the Committee has concerns regarding the marketing of the Debtor's assets during both the prepetition and postpetition period.  There is no mention in any of the Debtor's papers regarding whether there was any marketing of the assets in parts or that offers on portions of the assets were welcome.  There may be potential value in specific groups of assets, such as the Debtor's intellectual property, or the non-Debtor subsidiaries.  If such marketing and efforts have not occurred the Committee strongly believes that this needs to be explored before anyone can declare that there has been a true market test with respect to the Debtor's assets.

33.    This Court should deny the Bid Procedures and Sale Process Deadlines as submitted and set significantly extended deadlines to insure that all parties with an interest in the Sale have the opportunity to gather information concerning the Sale and that potential bidders have sufficient time to obtain due diligence, obtain financing commitments, and prepare an asset purchase agreement to submit a qualified bid.[4]

### 4.    <u>Credit Bidding Will Chill The Sale And Should Be Disallowed.</u>

---

[4] It should be noted that the Debtor has not even prepared a form asset purchase agreement for potential bidders to use, which is something that would seem standard for such a truncated sale process in order to ensure a level playing field and help maximize potential bidder interest.  The lack of a form asset purchase agreement also raises another significant issue with this sale process: what are the assets that are seeking to be sold?  "Substantially all assets" is rather vague given the corporate structure of this Debtor, its intellectual property history and the industry market that it serves.  For example, there are non-debtor subsidiaries that may or may not have assets but the subsidiaries are wholly owned by the Debtor – will the Sale transfer the subsidiary equity?

34.     Many Courts have held that while credit bidding is provided for in the Bankruptcy Code, it is not an absolute right.  *11 U.S.C. § 363(k)* (2014).  Courts may deny a lender the right to credit bid "in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."  *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 805 (Bankr. D. Va. 2014).  *In re Fisker Auto. Holdings, Inc. et al.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien." *Citations omitted*).

35.     In the present case, allowing credit bidding would likely chill bidding by cash bidders because prospective bidders may see secured claims in excess of the Debtor's apparent value and decide not to bid.  In actuality, however, it may be that the insider purchasers who are credit bidding may not have appropriate liens (or value in the collateral that secures those liens) in order to properly credit bid in the first instance. By way of example, the amount of Debtor's prepetition obligations due to the Pre-Petition Subordinate Noteholders is not clear.  The Declaration of Jeffrey Weiss indicates that the amount owed is $14.7 million but the Interim DIP Order indicates the amount owed is $19,614,700.  *See* Weiss Declaration, ¶ 23 and Interim DIP Order, ¶ E(vii).  An approximately $5 million discrepancy is significant and relevant to the credit bidding process.  Furthermore, the sixty-day lien challenge period in the DIP Financing will not expire until after the proposed Sale will have been approved and closed resulting in a "gotcha" for the Committee and the Debtor's unsecured creditors.  Once again, this is another aspect of this case and this process that is wholly illusory and evidence of the true nature of the motives of the parties involved.

**5.     The Preferential Treatment Given Credit Bidders Will Result In Chilling the <u>Bidding.</u>**

36.     Credit bidders, and the Agent in particular, receive a number of special considerations in the Bid Procedures that are highly likely to chill the bidding on the Debtor's assets.  First, despite the Bid Procedures requiring a portion of any winning bid to be cash, Credit Bidders are not required to make a deposit in order to have a qualified bid. Section VII (iv) of the Bid Procedures provides that no deposit will be required for a credit bid.  However, Section XI provides that a credit bid must include a cash component "sufficient to pay the Breakup Fee and any senior liens on the collateral that is subject to the credit bid…"  To the extent a cash component is a part of a credit bid, the credit bidder should be required to make a deposit just as a cash bidder would.  Any other treatment would unnecessarily discourage cash bidders.

37.     Second, Credit Bidders are not required to provide notice of their intent to bid, but can instead participate in the Auction without any advance notice.  Finally, the Bid Procedures provide that the Debtor will determine the highest and best bid in consultation with the Agent – who can participate in the Auction while privy to the specific details of every other bid. Individually, each of these issues gives rise to a potential chilling effect.  Together, their adverse effect on the Auction is a near certainty. Section XI of the Bid Procedures provides: "The Agent may, but shall not be required to, notify the Debtor prior to the Bid Deadline of its intent to credit bid at the Auction…"  This ability of the Agent to wait until the last moment to participate in the Auction is unnecessary and cannot possibly have a positive effect on the Auction.  Nor does such a right add value to the process.  If the Agent was required to provide the same notice as other bidders, no party would be adversely affected and the Auction would be perceived by potential participants as a more fair proceeding.  On the contrary, this disparity is likely to deter other bidders from getting involved.

42564523

38.    A credit bidder is also not required to be a Back-Up Bidder.  Section IX of the proposed Bid Procedures provides that the next-highest or otherwise second-best Qualified Bid will be the Back-Up Bid and the Back-Up Bidder will be required to consummate the sale if the Successful Bidder does not.  However, that section provides that "in no event will the Agent that submits a credit bid be required to serve as the Back-Up Bidder."  Bid Procedures, IX(a).  No reason is given for this exception and no value is added to the Auction thereby.  Rather, it creates the possibility that if a Successful Bidder other than the Agent does not consummate the transaction, the Debtor will be left without any buyer and all of the time and expense of the Auction will be wasted.

39.    Lastly, the Agent, who may also be a credit bidder, is aware of every bid that is made during the Sale process.  Section X of the Bid Procedures provide that the Debtor will determine the highest or otherwise best Qualified Bid "in consultation with the Agent…"  In essence, every other bidder will know that every bid they make will be known to an opposing bidder, and that the opposing bidder will not only be making bids of its own, it will be directly influencing the decision as to which bid is best.  Given this structure, it is unlikely any other party would be willing to engage in the Auction process.  The Agent has perfect knowledge of every bid that is made, has no deposit requirement, has no requirement to act as the Back-Up Bidder, has a direct say in which bid is determined to be highest and best, and incurs absolutely no cost to participate in the process.  It is inconceivable that the Bid Procedures as currently drafted would not have a chilling effect on the Auction.

40.    To this end and to the extent the Bid Procedures allow purportedly secured creditors to credit bid their liens, the Committee requests that this Court either (i) deny the ability to credit bid until the validity, extent, and priority of a particular lien is determined, or (ii) revise

the Bid Procedures to provide that the party intending to credit bid place cash into an escrow account pending the *bona fides* of the amount and extent of the lien being bid.  Currently, the Committee has until approximately November 27, 2016 to challenge asserted liens.[5]

## C.    The Debtor Has Provided No Basis To Waive The Stay.

41.    In its Bid & Sale Motion, the Debtor seeks to waive the application of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order."  "The purpose of this rule is to 'provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented.  A short period of time is often needed and essential to an objecting party intending to appeal because, if the sale is closed in the absence of a stay, any appeal by an objecting party may well be moot."  *In re Borders Group, Inc.*, 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011) (quoting 10 Collier on Bankruptcy ¶ 6004.11).  Similarly, pursuant to Bankruptcy Rule 6006(d), "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under 365(f) is stayed until the expiration of 14 days after the entry of the order."  The Debtor provides absolutely no justifications for the requested waiver.

42.    There is no basis for the requested relief and the Debtor has provided no evidence of a significant business exigency justifying waiver of the stay.  *See Borders Group,* 453 B.R. at 486. ("If an objection has been filed and is overruled, the court should eliminate or reduce the 14-day stay period 'upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account

---

[5] Pursuant to the Committee's Objection to the DIP Motion, filed concurrently herewith, the Committee is seeking a ninety (90) day Challenge Period from the appointment of the Committee.

42564523

the likelihood of success on appeal, are sufficiently protected.")  The Court should therefore deny any request to waive the fourteen-day stay required by Bankruptcy Rules 6004(h) and 6006(d).

## IV.    RESERVATION OF RIGHTS

43.    The Committee reserves its rights to supplement or otherwise adopt additional arguments in connection with this Objection up to and including at the hearing on approval of the Bidding Procedures.  Nothing contained herein shall be deemed as a waiver of any right of the Committee to object to the sale of substantially all of the Debtor's assets pursuant to 11 U.S.C. § 363 or otherwise.

## V.    CONCLUSION

**WHEREFORE**, for each of the foregoing reasons, the Committee respectfully requests that this Court enter an order (a) denying the approval of the Bidding Procedures Order approving the Sale Procedures unless modified to address the objections raised in this Objection; and (b) granting any further relief the Court deems proper and just.

Dated:  October 5, 2016                    FOX ROTHSCHILD LLP

                               By:    */s/ L. John Bird*
                                      L. John Bird (DE No. 5310)
                                      919 North Market Street, Suite 300
                                      Wilmington, DE  19801
                                      Telephone:  (302) 654-7444
                                      Facsimile:  (302) 656-8920
                                      lbird@foxrothschild.com
                                              -and-
                                      Michael A. Sweet, Esq.
                                      345 California Street, Suite 2200
                                      San Francisco, CA 94104-2670
                                      Telephone:  (415) 364-5540
                                      Facsimile:  (415) 391-4436
                                      msweet@foxrothschild.com

                                              -and-

18

Martha B. Chovanes, Esquire
Joshua T. Klein, Esquire
2000 Market Street, Twentieth Floor
Philadelphia, PA  19103-3222
Telephone: (609) 896-3600
Facsimile: (609) 896-1469
mchovanes@foxrothschild.com
jklein@foxrothschild.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

42564523

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2016, I caused copies of the following document to be served upon the parties listed on the attached **Service List** *via* U.S. mail, first class and postage prepaid:

*Objection Of The Official Committee Of Unsecured Creditors To The Debtor's Motion For Entry Of (I) An Order (A) Approving Bid Procedures In Connection With The Sale Of Substantially All, Or A Subset, Of The Debtor's Assets, (B) Approving The Form And Manner Of Notice Thereof (C) Scheduling An Auction And Sale Hearing, (D) Approving Procedures For The Assumption And Assignment Of Contracts And Leases, And (E) Granting Related Relief And (Ii) An Order (A) Approving The Asset Purchase Agreement Between The Debtor And Purchaser, (B) Authorizing The Sale Of Substantially All, Or A Subset, Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests, (C) Authorizing The Assumption And Assignment Of Contracts And Leases, And (D) Granting The Related Relief*

/s/ L. John Bird
L. John Bird (DE No. 5310)

42564523

Daniel Fiorillo, Esquire
Otterbourg, P.C.
230 Park Avenue
New York, NY  10169-0075

Chad Simon, Esquire
Otterbourg, P.C.
230 Park Avenue
New York, NY  10169-0075

David Buchbinder, Esquire
Office of the United States Trustee
for the District of Delaware
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801

FLFC Lending Co.
599 W. Putnam Avenue
Greenwich, CT  06830

Michael G. Busenkell, Esquire
Gellert Scali Busenkell & Brown, LLC
1201 North Orange Street, 3rd Floor
Wilmington, DE 19801

Ronald S. Gellert, Esquire
Gellert Scali Busenkell & Brown, LLC
1201 North Orange Street, 3rd Floor
Wilmington, DE 19801

Shannon Dougherty Humiston, Esquire
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange St., Ste. 300
Wilmington, DE 19801

Brya M. Keilson, Esquire
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801

Gregory G. Hesse, Esquire
Hunton & Williams LLP
1445 Ross Avenue, Suite 3700
Dallas, TX 75202-2799

Andrew L. Cole, Esquire
LeClairRyan, A Professional Corporation
800 North King Street, Suite 303
Wilmington, DE  19801

Janice B. Grubin, Esquire
LeClairryan, A Professional Corporation
885 Third Avenue, 16th Floor
New York, NY  10022

William P. Bowen, Esquire
Ashby & Geddes, P.A.
500 Delaware Ave., 8th Fl.
PO Box 1150
Wilmington, DE 19899-1150

Daniel J. Guyder, Esquire
Joseph Badtke-Berkow, Esquire
Benjamin Taylor, Esquire
Allen & Overy LLP
1221 Ave. of the Americas
New York, NY 10020